UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

R. ALEXANDER ACOSTA, Secretary of
Labor, United States Department of Labor,

                 Plaintiff,

      v.

CHARTER OAK HEALTH CENTER, INC.;
ALFREDA D. TURNER, in her official and
personal capacities,

                 Defendants.

Civil Action No.

June 12, 2017

## COMPLAINT

Defendants Charter Oak Health Center, Inc. ("Charter Oak") and Alfreda D. Turner

violated Section 11(c), 29 U.S.C. § 660(c), of the Occupational Safety and Health Act of 1970,

29 U.S.C. § 651 et seq. (the "Act"), by firing three employees—Doreen Coburn, Angela Griffin-

Wimberly[1] and Germaine Washington—because they engaged in protected activities related to

Charter Oak's inadequate response to the exposure of employees to a patient who had

tuberculosis ("TB") and later died. Coburn, Griffin-Wimberly, and Washington attempted to, or

were affiliated with efforts to, inform Charter Oak employees and the public about the TB

exposure and expand the TB testing of employees. Each of them was fired on the same day in the

wake of those efforts. Plaintiff R. Alexander Acosta, the Secretary of Labor, United States

Department of Labor (the "Secretary") specifically alleges as follows:

---

[1] Angela Griffin-Wimberly passed away on April 22, 2017.

I.      JURISDICTION AND VENUE

1.      The Secretary brings this case pursuant to Section 11(c) of the Act, 29 U.S.C.
§ 660(c). Among other things, Section 11(c)(1) of the Act prohibits the discharge of or
discrimination against "any employee because such employee has filed any complaint or
instituted or caused to be instituted any proceeding under or related to this chapter" fifteen of the
Act. 29 U.S.C. § 660(c)(1).

2.      Section 11(c)(2) grants the Secretary the authority to bring an action against any
person that violates Section 11(c) in "any appropriate United States district court," which "shall
have jurisdiction," and the power to "restrain violations of paragraph (1) of this subsection and
order all appropriate relief . . . ." 29 U.S.C. § 660(c)(2).

3.      This court has jurisdiction pursuant to 29 U.S.C. § 660(c)(2) and 28 U.S.C.
§ 1331.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b).
Defendants Charter Oak and Alfreda Turner reside in Connecticut. Charter Oak has a regular
place of business in Connecticut, and the events giving rise to the claims in this case occurred in
Connecticut.

II.     THE COMPLAINANTS AND DEFENDANTS

5.      Complainant Doreen Coburn began her employment at Charter Oak on or about
March 1, 2010 and was terminated on February 24, 2012. During Coburn's employment at
Charter Oak she held the titles of Executive Program Director and Vice President of Human
Resources, and Interim Senior Vice President of Operations. She was the Interim Senior Vice
President of Operations at Charter Oak at the times material to this case. Coburn worked full
time and earned a salary equal to approximately $69.79 per hour.

6.      Complainant Angela Griffin-Wimberly was hired as the Director of Nursing at Charter Oak on or about November 7, 2011, and held that title at the times material to this case. Her employment at Charter Oak was terminated on February 24, 2012. During Griffin-Wimberly's employment at Charter Oak she worked full time and earned a salary equal to approximately $46.88 per hour.

7.      Complainant Germaine Washington began her work at Charter Oak around January 2009, and received a number of promotions during her tenure at Charter Oak. At the times material to this case, Washington was the Coordinator of the Healthy Start program and supervisor of the medical assistants. Her employment at Charter Oak was terminated on February 24, 2012. During Washington's employment at Charter Oak she worked full time and earned approximately $26.04 per hour.

8.      At all times material to this case Coburn, Griffin-Wimberly, and Washington were employees of Charter Oak, as defined by 29 U.S.C. § 652(6).

9.      Charter Oak is a nonprofit federally qualified health center that provides medical, dental, and behavioral health services mainly to the uninsured and underinsured in the greater Hartford, Connecticut area.

10.     Defendant Alfreda D. Turner was the President and CEO of Charter Oak at all times material to this case. She signed the termination letters for all three complainants in this case—Coburn, Griffin-Wimberly, and Washington.

11.     At all times material to this case, each Defendant was a person as defined by 29 U.S.C. § 652(4).

III.    BACKGROUND

12.     In December 2011, Dr. Prince Morgan, a dentist at Charter Oak, received

notification from the Connecticut Department of Public Health ("DPH") that one of Charter

Oak's patients was infected with TB.

13.     On or about December 29, 2011, Dr. Morgan sent an email about this patient with

TB to Coburn, Griffin-Wimberly, and Dr. Moises Salas, who was the director of Charter Oak's

dental department and a member of Charter Oak's Infection Control Committee (the "ICC").

14.     This patient with TB died.

15.     As set forth in more detail below, in view of Defendants' inadequate responses to

this TB exposure at Charter Oak, Complainants Coburn, Griffin-Wimberly, and Washington

sought to inform Charter Oak employees and the public about the dangers associated with this

TB exposure, or they were affiliated with such efforts.

16.     Each Complainant's employment at Charter Oak was terminated because of these

efforts, or their affiliation with such efforts.

IV.    DEFENDANTS UNLAWFULLY RETALIATED AGAINST COBURN

17.     Coburn presented complaints to Charter Oak's senior management, the board of

directors, and ultimately the press about Charter Oak's inadequate response to the TB exposure.

18.     She was fired because of these efforts.

A.    Coburn's Prima Facie Case

**Coburn engaged in activity protected under Section 11(c) of the Act**

19.     DPH began investigating Charter Oak with an unannounced visit on January 20,

2012.

4

20.     Coburn met with DPH during the agency's January 20, 2012 unannounced visit to Charter Oak.

21.     On or about January 22, 2012, Coburn sent a letter to Defendant Turner, the board of directors at Charter Oak, the Health Resources Services Administration ("HRSA"), and DPH. In the letter, Coburn stated that she felt she was a whistleblower and documented at least some of her interactions with HRSA and DPH.

22.     On or about February 1, 2012, Coburn pled with Defendant Turner and others in senior management at Charter Oak to take action with respect to the TB because two Charter Oak employees had tested positive for TB.

23.     On or about February 2, 2012, Coburn called Betty Hardy, the then-president of the Charter Oak board of directors. She talked to Hardy about the TB issue and told her she did not know why Defendant Turner had not told Hardy about the issue.

24.     On or about February 3, 2012, Coburn contacted the news media about the TB situation at Charter Oak because she felt Charter Oak officials had not adequately addressed the issue.  She felt that employees of Charter Oak had the right to know about the TB and that Charter Oak management had not informed its employees and patients of the harm to which they were exposed. Fox News showed up at Charter Oak on or about the same day that Coburn contacted them about the TB situation.

25.     Nichelle Mullins, the then-Vice President of Compliance and Legal Affairs at Charter Oak, told the media that Charter Oak had known about the TB for only 24 hours.

26.     Coburn heard Mullins's statement to the media and, believing that it was a lie, called the media back. Coburn then went with two medical personnel and Complainant Washington to the press to correct that lie.

5

27.     Charter Oak knew that Coburn was the one who told the news media about the TB issue. Coburn spoke during the media report. Although Coburn's face was covered, Defendant Turner stated to the Occupational Safety and Health Administration ("OSHA") that she recognized Coburn's voice

28.     On or about February 6, 2012, Coburn filed an online complaint with OSHA.

29.     On or about February 16, 2012, DPH subpoenaed Coburn to testify in its investigation into Charter Oak.

30.     On February 21, 2012, Coburn testified at DPH regarding her knowledge of the TB situation.

**Charter Oak Took Adverse Action Against Coburn**

31.     On February 24, 2012, Charter Oak terminated Coburn in a letter signed by Defendant Turner.

32.     In addition to terminating Coburn, Charter Oak took various negative actions against her leading up to her termination. Coburn had been the interim vice president of operations since early in 2011. On January 20, 2012, which coincides with the timing of DPH's visit to Charter Oak, Charter Oak posted the vice president of operations position on Career Builder. The timing of that posting is suspect, particularly because it was the same day that Defendant Turner accused Coburn of turning Defendant Turner into DPH.

33.     In the wake of a HRSA site visit, the DPH inspection, and the TB issues, Defendant Turner's treatment of Coburn became progressively worse. Defendant Turner curtailed her interactions with Coburn and limited Coburn's access to certain drives.

**Coburn's Protected Activity Caused Charter Oak to Terminate Her Employment**

34.     As set forth above, Coburn engaged in several protected activities in early 2012.

35.     Charter Oak terminated Coburn's employment on February 24, 2012.

36.     The closeness in time between Coburn's protected activity and the adverse action that Charter Oak took against her constitutes prima facie evidence of causation.

37.     Coburn was terminated on the same day as Griffin-Wimberly and Washington.

B.   Defendants' Allegedly Legitimate Rationales for Firing Coburn Are Pretextual

38.     Coburn's termination letter was signed by Defendant Turner on behalf of Charter Oak. The reasons listed in the letter for firing her are pretextual.

39.     First, the letter alleged Coburn was fired for failing to ensure that the infectious disease control policy was implemented properly. According to Charter Oak's own internal policy documents, however, it was not Coburn's responsibility to oversee the response to a TB exposure; rather, that responsibility lay with the ICC, the chairperson of that committee, the chief medical officer, the Infection Control Officers, and the TB coordinator.

40.     Charter Oak's Policy and Procedure Manual governing infection control establishes "an Infection Control Committee, which is responsible for the review, update, implementation, enforcement and promulgation of the Infection Control Plan throughout the organization."

41.     The Charter Oak policies also state that "[t]he Infection Control Officer(s) oversees, coordinates and manages all aspects of infection prevention and control within the organization."

42.     The policies further state that "[t]he Infection Control Officer(s), the Chief Medical Officer and the Infection Control Committee (ICC) are responsible for determining the

actions and activities necessary to implement appropriate prevention and control initiatives in response to potential or actual cases of infection within [Charter Oak]."

43.   Coburn was not an Infection Control Officer.

44.   Coburn was not the Chief Medical Officer.

45.   Charter Oak's policies further require that there be a TB coordinator, who "monitors all potential exposures to TB, aggregates data related to both negative and positive tests, and presents this information to the ICC." Coburn was not the TB Coordinator.

46.   A consent order that Charter Oak entered into with DPH expressly recognizes that the development, implementation, and maintenance of Charter Oak's infection control program, and the establishment of an infection control committee, are the responsibility of a licensed physician with training in infectious disease control and the medical director of Charter Oak.

47.   Coburn was not a licensed physician or the medical director. Accordingly, it was not Coburn's responsibility to ensure compliance with Charter Oak's infection control policy. Nor was it her responsibility to ensure that a plan to deal with the TB was implemented.

48.   In addition, there were medical professionals who were members of the ICC and knew about the TB, but they, unlike Coburn, were not fired or disciplined for Charter Oak's failed response to that infectious disease exposure.

49.   Second, Charter Oak asserted that Coburn's firing was warranted because she was deficient in her supervision of Griffin-Wimberly, the director of nursing, who it asserted was responsible for identifying and testing employees exposed to TB.

50.   As an initial matter, Charter Oak's internal policies state that the nursing director, which was Griffin-Wimberly's title, was supposed to report to the medical director.

51.     Griffin-Wimberly, contrary to Charter Oak's internal policies, was not assigned to report to the medical director. Rather, she was assigned to report to Coburn, a non-medically trained supervisor.

52.     Coburn was on sick leave for approximately two weeks in December 2011. When she returned from sick leave on December 27, 2011, she spoke with Griffin-Wimberly about the TB and sought out a copy of the infectious disease manual for Griffin-Wimberly.

53.     Coburn also directed Griffin-Wimberly to test people for TB beyond the dental unit when it was clear that the exposure had gone beyond that unit. When Dr. Morgan was informed by DPH about the patient with TB, it was not clear that the exposure to the TB extended beyond Charter Oak's dental department.

54.     Given Coburn's lack of medical training and the scope of her responsibilities with respect to infectious disease at Charter Oak, Coburn was not at fault for failing to direct Griffin-Wimberly differently than she did with respect to the TB.

55.     Third, Charter Oak alleged it was justified in firing Coburn because she supposedly failed to immediately advise Defendant Turner and senior management that a former patient had TB and of the plans to address the situation.

56.     Charter Oak's assertion is flawed for several reasons. Under Charter Oak's policy, the chief medical officer had responsibility for advising staff about the existence of potential and actual sources of infectious disease. Coburn was not the chief medical officer or a licensed physician.

57.     In addition, DPH contacted Dr. Morgan, a dentist at Charter Oak, about the TB exposure, and on December 29, 2011 he sent an e-mail to his supervisor, the Dental Director, advising him about the TB.

9

58.     Moreover, Coburn heard about the TB from Defendant Turner, the CEO, during a telephone call in December of 2011 while Coburn was on sick leave.

59.     Defendant Turner, in an apparent attempt to evade culpability for her failure to appropriately address the TB situation, stated that she did not know about the TB until early February 2012.

60.     Defendant Turner's assertion is contradicted by reports from the U.S. Centers for Medicare and Medicaid Services ("CMS") and DPH.

61.     CMS recognized in its summary of deficiencies that Defendant Turner was aware of the TB on December 29, 2011.

62.     DPH recognized in its findings of regulatory violations that Defendant Turner had called Coburn in December 2011 regarding the TB.

63.     The written findings by the CMS and DPH that Defendant Turner knew about the TB in December 2011 are buttressed by the fact that numerous high-level officials and doctors at Charter Oak, as well as Defendant Turner's assistant, knew about the TB prior to February 2012. One of the doctors with knowledge about the TB incident in December 2011 was Dr. Morgan, who was named as the Chair of the ICC in mid-February 2012.

64.     Lastly, the termination letter stated that Coburn was fired for misleading and misrepresenting facts to senior management. The letter alleged that on February 1, 2012, Coburn told senior management she had merely heard a rumor regarding a patient with TB. This assertion is false. As noted above, on or about February 1, 2012, Coburn pled with Defendant Turner and others in senior management to take action with respect to the TB because two Charter Oak employees had tested positive.

**Additional Allegations of Pretext**

65.     Around the time of the DPH visit on January 20, 2012, Defendant Turner stood outside Coburn's door, looked at Coburn, and said that she knew who called DPH and that person would lose their job.

66.     Defendant Turner's hostility toward Coburn for spurring public oversight of Charter Oak undermines the idea that Coburn was fired for performance reasons. Indeed, Defendant Turner directly threatened Coburn with the loss of her job because she contacted DPH.

67.     One of Defendant Turner's assistants sent an email to Defendant Turner that reveals that those close to Defendant Turner were fed up with Coburn spurring public scrutiny of Charter Oak.

68.     On February 7, 2012, the assistant emailed Defendant Turner a February 6, 2012 article from the Hartford Courant. That article cited an anonymous source to highlight the question of whether Defendant Turner knew about the TB exposure before she said she knew about it.

69.     In the subject line of the email, the assistant wrote "(SHE JUST WON'T STOP....)," apparently referring to Coburn.

70.     Charter Oak's stated rationales for terminating Coburn are further undermined by the fact that Coburn had no disciplinary record prior to the TB exposure at issue here.

V.     DEFENDANTS UNLAWFULLY RETALIATED AGAINST GRIFFIN-WIMBERLY

71.     Griffin-Wimberly received a stern response from Charter Oak senior management when she started spreading the word among Charter Oak employees that they all should be tested for TB. She was fired because of her attempt to protect employees and because of other efforts.

11

A.  <u>Griffin-Wimberly's Prima Facie Case</u>

**Griffin-Wimberly Engaged in Protected Activity**

72.     On or about February 3, 2012, when Griffin-Wimberly found out that two Charter Oak employees had tested positive for TB, Griffin-Wimberly started telling everyone to get tested.

73.     That same day, Defendant Turner called Griffin-Wimberly into a meeting to ask what she had done about the TB and when she first knew about the exposure.

74.     In the course of that meeting, Griffin-Wimberly told Defendant Turner and other senior management that she was now telling everyone to be tested. In Defendant Turner's presence, Mullins told Griffin-Wimberly that she should not have had anyone tested because that was a conflict of interest.

75.     Griffin-Wimberly then asked Defendant Turner if she was correct to start testing employees, and Defendant Turner said she could not answer at that time.

76.     Griffin-Wimberly received a subpoena at home to testify at DPH, which was dated February 16, 2012.

77.     On February 21, 2012, Griffin-Wimberly gave testimony at DPH in connection with the TB-related issues.

**Defendants Took Adverse Action Against Griffin-Wimberly**

78.     Charter Oak suspended Griffin-Wimberly on February 17, 2012.

79.     Defendant Turner terminated Griffin-Wimberly by letter on February 24, 2012.

**Griffin-Wimberly's Protected Activity Caused Defendants to Discipline Her**

80.     Griffin-Wimberly was suspended and fired within weeks of communicating to senior management that she was telling everyone to be tested for TB and in close temporal proximity to giving testimony at DPH.

81.     The closeness in time between Griffin-Wimberly's protected activity and the adverse action that Charter Oak took against her constitutes prima facie evidence of causation.

82.     She was also fired on the same day as Coburn and Washington.

B.  Defendants' Allegedly Legitimate Reasons for Disciplining Griffin-Wimberly Are Pretextual

83.     Defendant Turner's termination letter to Griffin-Wimberly stated that she was fired for failing to exercise good judgment, failing to show a sense of urgency, and failing to develop and implement a plan, all with respect to the TB issue. The letter goes on to list numerous alleged deficiencies in Griffin-Wimberly's performance. As detailed below, the alleged deficiencies are pretextual.

84.     Charter Oak first asserted that Griffin-Wimberly should have convened the ICC. That assertion ignores the fact that it was not Griffin-Wimberly's responsibility to convene the ICC, nor did she have the power to do so.

85.     According to Charter Oak's own policies, it is the chairperson of the ICC, or her designee, that has the authority to call a special meeting of the committee, outside of the quarterly meetings that are required by the committee's bylaws.

86.     Griffin-Wimberly's job description did not contemplate her leading any aspect of Charter Oak's response to the TB exposure. With respect to infection control activities, the Nursing Director's job description states that the position: "Ensures an appropriate environment

for the administration of healthcare by keeping exam rooms, nurses' station, all equipment, and other work areas in a clean, safe, and orderly fashion."

87.     Second, Charter Oak alleged that Griffin-Wimberly should have consulted with the infectious disease doctor. However, that claim overlooks the fact that Griffin-Wimberly was the one who brought the TB issue to the infectious disease doctor's attention in January 2012.

88.     Third, Charter Oak claimed Griffin-Wimberly's performance was deficient because she did not advise Defendant Turner about the TB or a plan of action. As detailed above in paragraphs 58–63, Defendant Turner was aware of the TB in December 2011.

89.     In addition, under Charter Oak's policies, it was not Griffin-Wimberly's responsibility to advise staff generally about the existence of potential and actual sources of infectious disease—that responsibility lay with the chief medical officer.

90.     Fourth, Charter Oak alleged that Griffin-Wimberly did not create of list of people to test for TB. However, she did create a list of people to be tested soon after December 29, 2011 and then waited for further direction.

91.     She also tried to determine what health care providers had been in contact with the TB patient.

92.     Further, the Infection Control Officer at Charter Oak has the responsibility to oversee immunizations and screenings with respect to infectious diseases; Griffin-Wimberly was not the Infection Control Officer.

93.     Fifth, Charter Oak asserted that Griffin-Wimberly should have established a testing protocol for those potentially exposed to the TB after their last test. That claim is inconsistent with the fact that Griffin-Wimberly did not have responsibility for overseeing TB

testing and screening at Charter Oak. Rather, as alleged above, it is the Infection Control Officer who has the responsibility to oversee immunizations and screenings with respect to infectious diseases.

94.     Additionally, Griffin-Wimberly could not have made decisions about addressing the TB exposure without a vote of the ICC, as "[a]ctions of the Infection Control Committee, other than the approval of proposed infection control policies, shall require a majority vote of approval by members of the Committee."

95.     Further, Griffin-Wimberly was not the TB coordinator at Charter Oak, and it is the person with that title who "monitors all potential exposures to TB, aggregates data related to both negative and positive tests, and presents this information to the ICC."

96.     Defendants did not want Charter Oak employees testing other Charter Oak employees due to concerns about confidentiality and liability.

97.     As the director of nursing, Griffin-Wimberly would not have had the authority to set up TB testing for Charter Oak employees at an external site.

98.     Griffin-Wimberly's job description did not contemplate her developing any infectious disease protocols. Rather, the job description states that the nursing director is responsible for the more straightforward infection control work of keeping Charter Oak clean and orderly.

99.     Sixth, Charter Oak stated that Griffin-Wimberly should have notified patients and the public about the TB. That assertion is pretextual. On or about February 1, 2012, Coburn pled with Defendant Turner and others in senior management to address the TB issue in view of Charter Oak's employees testing positive.

100.     Defendant Turner's response was that she did not want to publicize the TB and wanted to avoid mass hysteria.  That response reveals that Defendant Turner did not want the TB issue publicized.

101.     With respect to the notification of patients, the patient's clinical provider has responsibility for letting the patient know of actual or potential exposure to an infectious disease, not the director of nursing.

102.     Lastly, Charter Oak asserted that Griffin-Wimberly erred in failing to report TB test results to DPH. However, Charter Oak's policies state that it is the providers who are responsible for reporting communicable diseases to DPH.

103.     Charter Oak's policies also separately state that it is the TB coordinator who is charged with notifying DPH of any contact with active TB.

104.     Griffin-Wimberly was not the TB coordinator.

105.     Griffin-Wimberly did not have access to other employees' occupational health files where their TB test results were located.

### Additional Allegations of Pretext

106.     There were other medical professionals, including the infectious disease doctor and the dental director, who should have had responsibility to do many, if not all, of the things for which Charter Oak terminated Griffin-Wimberly, such as: consulting the infectious disease doctor; creating a protocol and plan; and advising the CEO.

107.     Griffin-Wimberly was not supervised by medical staff; instead, she was supervised by Coburn. The nursing director was supposed to report to the medical director, but instead Griffin-Wimberly was assigned to report to the interim senior vice president for operations, Coburn.

16

108.     Griffin-Wimberly was closely associated with Coburn. On or about February 4, 2012, an attorney for Charter Oak questioned Griffin-Wimberly and asked when she had spoken with the State and what she knew about Coburn's connection to the TB issues.

VI.     DEFENDANTS UNLAWFULLY RETALIATED AGAINST WASHINGTON

109.     Charter Oak inquired into and was quite interested in Washington's connections to Coburn and the media, and terminated her based on that affiliation and in the wake of Washington's testimony to OSHA.

A.     Washington's Prima Facie Case of Retaliation

**Washington Engaged in Protected Activity**

110.     On or about February 16, 2012, Washington spoke with OSHA and OSHA questioned Washington about the TB.

111.     Charter Oak had knowledge of Washington's testimony to OSHA because its lawyer summoned Washington for the interview with OSHA.

112.     Defendant Turner knew that Washington was speaking to OSHA because Defendant Turner saw her giving the interview through a window.

113.     On or about January 20, 2012, DPH interviewed Washington regarding the Healthy Start program, though nothing about TB was discussed during that interview.

114.     Defendant Turner knew about this meeting, and asked Washington what happened at the meeting, including if everything was okay. While there was nothing about TB discussed at Washington's meeting with DPH, Defendant Turner also asked Washington when she came out of the interview whether DPH had questioned Washington about the TB.

17

115.     Washington accompanied Coburn to a parking lot where Coburn met with the media.

**Charter Oak Took Adverse Action Against Washington**

116.     In a February 24, 2012 letter from Defendant Turner to Washington, Charter Oak terminated Washington's employment.

**Charter Oak Fired Washington Because of Her Protected Activity**

117.     Washington was fired a short time after the media story broke and the week after she met with OSHA.

118.     The closeness in time between Washington's protected activity and the adverse action that Charter Oak took against Washington constitutes prima facie evidence of causation.

119.     She was also fired on the same day as Coburn and Griffin-Wimberly.

B.   Defendants' Alleged Non-discriminatory Rationales for Firing Washington Are Pretextual

120.     The termination letter states that Washington was fired because she allegedly submitted a quarterly report—for the period from September 1, 2011 to November 30, 2011—stating both that she had not performed any activity as the Healthy Start program coordinator and that she had used a company vehicle during that period on nine occasions; the company vehicle should have only been used for program activities.

121.     The letter further states that Washington should have had some program activity listed during that quarter, at least as of October 27, 2011, when she was reassigned to coordinate the Healthy Start program full-time.

122.     Charter Oak maintains that Washington misrepresented the basis on which she was using the company vehicle and falsely represented to Charter Oak that she was indeed performing work on the Healthy Start program during the quarter in question.

18

123.     The facts surrounding Washington's firing do not support Charter Oak's rationales for terminating her employment.

124.     The quarterly report cited by Charter Oak is confusing and unclear in numerous respects. For example, although Washington stated in the report that no program-related work was performed during the period, other sections of the report she filled out list Healthy Start-related meetings that Washington attended during that quarter.

125.     One of the dates of one of those meetings—September 13, 2011—is a date on which Washington used the company vehicle.

126.     The quarterly report also states that Washington attended a November 15, 2011 meeting at The Hartford Healthy Start Program Staff Enrichment Series; she is also listed on the attendance sheet for that meeting.

127.     Washington was working with numerous women and their children during the time in question, and she used the company car during the pertinent time period to transport then-current clients.

128.     The quarterly report just prior to the one at issue shows that Washington had a client base of 46 adults and 45 children as of August 31, 2011, and that three new clients were enrolled during that quarter.

129.     Washington's supervisor did not bring the issue of the report to Washington's attention prior to Washington's termination. During the week of February 17, 2012, Washington met with her acting supervisor, Christine Daly, for a weekly one-on-one supervision meeting, and no problems were brought to Washington's attention in that meeting.

130.     No one at Charter Oak ever talked to Washington about problems with the report before she was fired on February 24, 2012.

131.     The report was submitted in December 2011 and Washington was not terminated until the end of February 2012.

132.     Defendant Turner and the Charter Oak financial officer, Thomas Morrison, certified that the expenditures related to the quarterly report in question, including salaries and travel, complied with Charter Oak's contract with DPH for the Healthy Start program.

133.     Washington did not receive new client referrals during the period in question and, accordingly, did not turn down any new clients.

134.     Defendants used the DPH Healthy Start program funds to pay Washington a salary for work unrelated to the Healthy Start program. Washington's salary as the Healthy Start coordinator was to be paid in full through the pertinent grant from DPH.

135.     Washington was also tasked with managing the medical assistants, which was formerly a full-time position.

136.     Defendant Turner unilaterally decided to use the DPH grant money to pay Washington for her combined responsibilities even though the supervisory responsibilities were not contemplated by the DPH grant and consumed more than half of Washington's time.

**Additional Allegations of Pretext: Washington's Connection to Coburn and the Media**

137.     During the week of February 9, 2012, Defendants' attorney asked Washington about her relationship with Coburn, including the last time she heard from Coburn and whether she knew anything about Coburn going to the media; the attorney also asked Washington for her personal cell phone.

138.      Defendants' attorney wanted to see any phone or text contact that Washington had with Coburn.

139.     Washington refused to give the attorney her personal cell phone, but gave him her work cell phone.

140.     Washington thought she was going to be fired because she did not provide to Charter Oak her personal cell phone.

141.     There was nothing work related on Washington's personal cell phone.

## PRAYER FOR RELIEF

WHEREFORE, the Secretary prays that this court:

1.     Adjudge that Defendants Charter Oak and Turner wrongfully discharged Coburn, Griffin-Wimberly, and Washington because they engaged in activity protected by Section 11(c) of the Act, 29 U.S.C. § 660(c).

2.     Order Defendants Charter Oak and Turner, as well as their agents, servants, employees and all persons acting or claiming to act on their behalf and interest, to comply with the provisions of Section 11(c) of the Act, 29 U.S.C. § 660(c).

3.     Grant all appropriate relief, including without limitation:

    a.     Require Defendants Charter Oak and Turner to pay Coburn, the Estate of Angela Griffin-Wimberly, and Washington's lost wages, as well as the interest thereon;

    b.     Require Defendants Charter Oak and Turner to pay any other damages relating to their actions, to include compensatory damages;

    c.     Require Defendants Charter Oak and Turner to provide Coburn and Washington with neutral letters of reference;

d.  Require Defendants Charter Oak and Turner to expunge from their files any statement regarding the termination of Coburn, Griffin-Wimberly, and Washington;

e.  Require Defendant Charter Oak to post in a prominent location at Charter Oak a notice easily seen and readable by employees that Defendant Charter Oak will not in any manner discriminate against employees because of such employees' engagement in activities protected by Section 11(c) of the Act, 29 U.S.C. § 660(c);

f.  Require Defendant Charter Oak to disseminate electronically to all current employees at Charter Oak and all employees hired by Charter Oak for two years from the date of any judgment a notice of such employees' rights to not be discriminated against for engaging in whistleblowing activity under Section 11(c) of the Act, 29 U.S.C. § 660(c); and

g.  Grant such other relief as is just and proper.

Post Office Address:

U.S. Department of Labor
Office of the Solicitor
JFK Federal Building
Room E-375
Boston, MA  02203
TEL: (617) 565-2500
FAX: (617) 565-2142

Date:   June 12, 2017

Nicholas C. Geale
Acting Solicitor of Labor

Michael D. Felsen
Regional Solicitor

/s/ Kelly M. Lawson
Kelly M. Lawson[2]
Counsel for Civil Rights
lawson.kelly@dol.gov
MA BBO No. 650410

---

[2] As required by Section XI.D of the Electronic Filing Policies and Procedures for the United States District Court for the District of Connecticut, attorney Kelly M. Lawson hereby gives her consent to attorney Mark A. Pedulla to electronically file this document with her electronic signature.

/s/ Mark A. Pedulla_____
Mark A. Pedulla
Trial Attorney
pedulla.mark.a@dol.gov
MA BBO No. 685925

U.S. Department of Labor
Attorneys for Plaintiff